## THE BRYANT AND CHAPMAN COMPANY *v.* JAMES B. LOWELL, DAIRY AND FOOD COMMISSIONER.

MALTBIE, C. J., AVERY, JENNINGS and ELLS, Js.[1]

[1] By agreement of counsel the case was argued before and decided by four judges.

Argued June 5—decided July 16, 1942.

*John Buckley,* with whom was *Thomas F. Gallivan, Jr.,* for the appellant (plaintiff).

*Joseph P. Smith,* assistant attorney general, with whom, on the brief, was *Francis A. Pallotti,* attorney general, for the appellee (defendant).

JENNINGS, J. The state dairy and food commissioner has complied with all of the formalities laid down by General Statutes, Sup. 1941, § 431f, with respect to inspection of certain out-of-state milk producers and has refused to approve them except on certain conditions hereinafter stated. The plaintiff seeks by mandamus to require the defendant to file his decision without imposing these conditions. As

found by the trial court, this issue is not clearly presented by the pleadings and stipulated facts, but the briefs show that the parties desire an adjudication on the issue stated and we shall treat the case as presented by them. Conn. App. Proc., § 22. The case involves a construction of the statute cited.

The following facts are found: The plaintiff is engaged in the sale, handling and distribution of milk in Hartford and is the holder of a permit to import milk from dairies outside of the state which are registered in Connecticut and are producing, or which may produce, fresh milk for daily use in Connecticut and are within the "natural milk shed" area of Connecticut, provided they have inspection approvals of the defendant. The defendant is the dairy and food commissioner of Connecticut and as such has authority to issue permits for the importation of milk, to institute prosecutions for the illegal importation of milk and to revoke an importer's permit when illegally used. The Producer Dairies of Hillsdale Producers Cooperative, Inc., are located in the Hillsdale, New York, area adjacent to the New York-Connecticut state line. Their location is such that they can supply fresh milk for daily use in Connecticut and they have registered with the defendant. On November 3, 4 and 5, 1941, these dairies were inspected by the defendant at state expense pursuant to the provisions of § 431f and were found to comply with the Connecticut standards of sanitation and public health. The plaintiff has contracted to purchase from these dairies a quantity of fresh milk for daily delivery and use in Connecticut and is desirous of importing their milk into the state. The defendant refused to approve these dairies as a source of milk supply for daily use as fresh milk in the state of Connecticut because he found that there was no shortage of milk in the state milk shed, that

no emergency existed and that the "dairies were beyond the natural milk shed." On these facts the trial court concluded that the determination of the area of the natural milk shed outside the state at any particular time involved a decision on a question of fact which was by statute delegated to the defendant and that the latter's action in that regard could not be controlled by mandamus.

The problem of milk control has produced much legislation and litigation. Some idea of its size and complexities may be obtained by examining the reports of the federal trade commission on this subject. Four of them, House Documents No. 387, 451, 501 and 506, 74th Congress, 2d Session, make a volume of over five hundred pages. Little light has been found, however, on the definition of a variable milk shed such as has been attempted in the Connecticut statute. The portion relevant to this inquiry is quoted in a footnote.[1] The definition of the natural milk shed of Con-

---

[1] Sec. 431f. REGULATION AND EQUIPMENT OF DAIRIES. For the purposes of this section, the natural milk shed of Connecticut, in addition to the state itself, is that area or areas adjacent to the state in which fresh milk for daily use in Connecticut is produced, or may be produced, and which gradually expands or contracts over a contiguous milk producing area in accordance with the operation of the law of supply and demand. Dairy farms located in the natural milk shed and outside the boundaries of this state, and producing fresh milk for daily use in this state, shall be subject to the same registration, inspection and approval as dairy farms located in this state and producing milk for sale in this state. The expense of inspection of any dairy farms producing fresh milk for daily use in this state shall be borne by the state. The dairy and food commissioner shall not inspect dairy farms for the production of milk which are located beyond the natural milk shed of this state except in the event of a milk shortage in such state milk shed, or in the event of an emergency. The expense of inspection of dairy farms and dairy plants located outside the boundaries of this state, which dairy farms produce, and dairy plants process, milk or cream for this state, shall be borne by the producer or dealer. The dairy and food commissioner shall have the right to inspect the producing dairy farm or the processing

necticut is contained in the first sentence. It is not a definition by metes and bounds. The first part describes it as the area, in addition to the state itself, adjacent thereto, in which fresh milk for daily use in Connecticut is produced or may be produced. This presents a comparatively simple question of fact. Can the milk be preserved and transported to Connecticut in time to be usable as fresh milk? This reasonably ascertainable area is however burdened with another qualification for it "gradually expands or contracts over a contiguous milk producing area in accordance with the operation of the law of supply and demand." The law of supply and demand is not found in any statute book. There is no method by which it can be applied to determine the number of square miles which should be added to the area of the state as a natural milk shed outside of the state's boundaries. In § 952c of the Cumulative Supplement, 1935, the commissioner was forbidden to inspect dairies beyond "the natural or present milk shed" of the state except in the event of a milk shortage or an emergency. In § 875e of the Cumulative Supplement, 1939, the provision was amended to read "the natural milk shed" of the state. The apparent purpose of the clause under consideration was to make it clear that the area of the natural milk shed was not one which was fixed as of any particular time but was one which would fluctuate from time to time in accordance with the law of supply and demand. The qualification adds nothing to and subtracts nothing from the definition and may be disregarded. It is merely descriptive.

The basic reason of the defendant for refusing to

dairy plant or sample the product of such dairy farm or dairy plant at any time or place. The dairy and food commissioner shall issue separate permits for the importation of milk and for the importation of cream.

approve the dairies was that they were beyond the natural milk shed. The facts stipulated bring these dairies squarely within the statutory definition of the natural milk shed as interpreted above. They are so located that the milk which is or may be produced can be supplied as fresh milk for daily use in this state.

The defendant claims that it was the intention of the legislature to delegate to him the authority to define the boundary of the natural milk shed in accordance with the operation of the law of supply and demand and that before he can find out-of-state dairies within the natural milk shed he must first find that a shortage or emergency exists in Connecticut. That intention is not expressed and cannot be implied from the vague qualification of the definition of the natural milk shed for the reasons stated above. Even assuming that his contention is correct, his position is not improved. The dairies have registered with him and he has inspected them. The statute provides that he shall not inspect "dairy farms for the production of milk which are located beyond the natural milk shed of this state except in the event of a milk shortage in such state milk shed, or in the event of an emergency." He found that there was no shortage and that no emergency existed. Since it cannot be assumed that he would act in direct contravention of the express direction of the statute, it follows that under his own construction of the statutory definition he has found that the dairies in question were in the natural milk shed. If he intended to insist on the construction for which he now contends, he should not have inspected the dairies at state expense. His claim that the words "for the production of milk" indicate that he can inspect the dairies without any intention of acting on that inspection until he finds that conditions require it is without merit.

The underlying purpose of the section under consideration is to protect the health of the citizens of Connecticut by securing a safe milk supply, whether that supply comes from Connecticut or from beyond its borders. To that end, the defendant is given wide powers and discretion. That discretion cannot be controlled by mandamus, but when he attaches illegal conditions to its exercise he may be ordered to act without imposing these conditions. *State* v. *Erickson,* 104 Conn. 542, 545, 133 Atl. 683. It is found that the conditions attached to his approval were, first, that there was no shortage of milk and that no emergency existed, and, second, that the dairies were beyond the natural milk shed. For the reasons stated, neither of these conditions is valid and he should have been ordered to file his decision without imposing these conditions, in accordance with the prayer of the alternative writ.

There is error, the judgment is set aside and the case is remanded for entry of judgment that the defendant file his decision on his inspection without imposing as a condition that a milk shortage or emergency exists in the state of Connecticut.

In this opinion MALTBIE, C. J., and AVERY, J., concurred.

ELLS, J. (dissenting). Upon the agreed facts stated in the majority opinion, the issue is whether the defendant is justified in refusing to approve the dairies in question because he found that no shortage of milk or emergency existed and that they were beyond the natural milk shed of the state, and whether such approval may be compelled by mandamus.

The applicable statute, § 431f, describes the natural milk shed of Connecticut as being the state itself and

those areas adjacent to it where fresh milk for daily use in Connecticut is produced "and which gradually expands or contracts over a contiguous milk producing area in accordance with the operation of the law of supply and demand." Obviously the quoted clause is abstruse. The effect of the majority opinion is to erase it from the statute by saying it is to be disregarded, but I believe this clause to be the heart of the case. Upon careful analysis its meaning seems fairly apparent. What the definition contemplates is that the areas without the state to be included in the state milk shed shall vary in extent according as conditions of supply and demand within the state require additions to the supply from outside. Logically the existence and extent of such need and the consequent areas to be drawn upon must vary from time to time and must be determined, and the natural authority to do it would be the commissioner.

The majority opinion states the purpose of the statute to be the protection of the health of the citizens of Connecticut by securing a safe milk supply, whether that supply comes from Connecticut of from beyond its borders. The statute means much more than that; it is also directed against the dumping of foreign milk during times when the state market is fully supplied by milk produced by our own citizens. When there is not a sufficient supply, milk may be imported from areas adjacent to the state in which fresh milk for daily use in Connecticut is produced, provided it is clean milk, according to our standards. The constitutionality of such an anti-dumping statute cannot be raised in an application for a mandamus. *Holley* v. *Sunderland,* 110 Conn. 80, 147 Atl. 300.

It follows that, in my judgment, the action of the trial court in directing judgment for the defendant was correct.